## TIMKEN ROLLER BEARING CO. *v.*
## UNITED STATES.

No. 352.   Argued April 24, 1951.—Decided June 4, 1951.

*Luther Day* and *John G. Ketterer* argued the cause and filed a brief for appellant.

*W. Perry Epes* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Charles H. Weston* and *J. Roger Wollenberg.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The United States brought this civil action to prevent and restrain violations of the Sherman Act [1] by appellant,

---

[1] 26 Stat. 209, 15 U. S. C. §§ 1–4.

Timken Roller Bearing Co., an Ohio corporation. The complaint charged that appellant, in violation of §§ 1 and 3 of the Act,[2] combined, conspired and acted with British Timken, Ltd. (British Timken), and Societe Anonyme Française Timken (French Timken) to restrain interstate and foreign commerce by eliminating competition in the manufacture and sale of antifriction bearings in the markets of the world. After a trial of more than a month the District Court made detailed findings of fact which may be summarized as follows:

As early as 1909 appellant and British Timken's predecessor had made comprehensive agreements providing for a territorial division of the world markets for antifriction bearings. These arrangements were somewhat modified and extended in 1920, 1924 and 1925. Again in 1927 the agreements were substantially renewed in connection with a transaction by which appellant and one Dewar, an English businessman, cooperated in purchasing all the stock of British Timken. Later some British Timken stock was sold to the public with the result that appellant now holds about 30% of the outstanding shares while Dewar owns about 24%.[3] In 1928 appellant and Dewar organized French Timken and since that date have together owned all the stock in the French company. Beginning in that year, appellant, British Timken and French Timken have continuously kept operative "business agreements" regulating the manufacture and sale of antifriction bearings by the three companies and providing for the use by the British and French corporations of the trademark "Timken." [4] Under these agreements

---

[2] These sections declare illegal all contracts, combinations or conspiracies in restraint of trade or commerce among the states and territories or with foreign nations.

[3] Dewar died while the appeal in this case was pending. See note 10, *infra*.

[4] The most recent of these agreements, which was to have governed the conduct of the parties until 1965, is dated November 28, 1938.

the contracting parties have (1) allocated trade territories among themselves; (2) fixed prices on products of one sold in the territory of the others; (3) cooperated to protect each other's markets and to eliminate outside competition; and (4) participated in cartels to restrict imports to, and exports from, the United States.

On these findings, the District Court concluded that appellant had violated the Sherman Act as charged, and entered a comprehensive decree designed to bar future violations. 83 F. Supp. 284. The case is before us on appellant's direct appeal under 15 U. S. C. § 29.

Although appellant has indiscriminately challenged the District Court's judgment and decree in over 200 separate assignments of error, the real grounds relied on for reversal are only a few in number.[5] In the first place, appellant contends that most of the District Court's material findings of fact are without evidential support, that they "ignore or fail properly to evaluate" evidence supporting appellant's position, and that it was error for the court to refuse to make additional findings. For the most part, this shotgun approach is actually only a dispute as to the proper inferences to be drawn from the evidence in the record;[6] in effect, it is an invitation for

_____

[5] Appellant originally attacked the decision below in 206 assignments of error, including 69 alleged errors in the District Court's findings of fact, 26 in its conclusions of law, and 62 based on the court's refusal to make new and additional findings. (Later appellant abandoned 5 of the assignments.) These assignments are unduly repetitious, some are frivolous, and the excessive number obscures the actual grounds on which appellant relies for reversal. As the Government pointed out in its motion to dismiss the appeal, our prior cases justify dismissal in such situations. See *Local 167* v. *United States,* 291 U. S. 293, 296; *Phillips & Colby Construction Co.* v. *Seymour,* 91 U. S. 646, 648. We do not take that action, however, since appellant in its brief opposing the Government's motion has sufficiently spelled out the few real objections it raises here.

[6] This is well illustrated by the following portion of the "Summary of Argument" which appears in the appellant's brief: "The evidence

us to try the case *de novo*.  This Court must decline such an invitation just as it does when the Government makes the same request.  *United States* v. *Yellow Cab Co.*, 338 U. S. 338.  In the present case, the trial judge after a patient hearing carefully analyzed the evidence in an opinion prepared with obvious care.[7]  Appellant's lengthy brief has failed to establish that there was error in making any crucial, or even important, ultimate or subsidiary finding.  Since we cannot say the findings are "clearly erroneous," we accept them.  Fed. Rules Civ. Proc., 52 (a).

Appellant next contends that the restraints of trade so clearly revealed by the District Court's findings can be justified as "reasonable," and therefore not in violation of the Sherman Act, because they are "ancillary" to allegedly "legal main transactions," namely, (1) a "joint venture" between appellant and Dewar, and (2) an exercise of appellant's right to license the trademark "Timken."

We cannot accept the "joint venture" contention. That the trade restraints were merely incidental to an otherwise legitimate "joint venture" is, to say the least, doubtful.  The District Court found that the dominant purpose of the restrictive agreements into which appellant, British Timken and French Timken entered was to avoid all competition either among themselves or with

---

relied upon by the district court as demonstrating conduct of an intentional restraint of trade by the three Timken companies from 1928 on is just as reconcilable with the conduct of a legal joint adventure as with the conduct of a combination for the purpose of suppressing competition and controlling world trade in tapered roller bearings, and therefore the district court's decision to the contrary is clearly erroneous."  Brief for Appellant, pp. 78–79.

[7] Appellant claims the District Court's findings of fact and conclusions of law failed to comply with Rule 52 (a) of the Federal Rules of Civil Procedure.  We think that the opinion below meets all the requirements of the Rule.

others. Regardless of this, however, appellant's argument must be rejected. Our prior decisions plainly establish that agreements providing for an aggregation of trade restraints such as those existing in this case are illegal under the Act. *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, 213; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 223–224 and note 59; *United States* v. *National Lead Co.,* 63 F. Supp. 513, affirmed, 332 U. S. 319; *United States* v. *American Tobacco Co.,* 221 U. S. 106, 180–184; *Associated Press* v. *United States,* 326 U. S. 1, 15. See also *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 439–445. The fact that there is common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws. *E. g., Keifer-Stewart Co.* v. *Seagram & Sons, supra* at 215. Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a "joint venture." Perhaps every agreement and combination to restrain trade could be so labeled.

Nor can the restraints of trade be justified as reasonable steps taken to implement a valid trademark licensing system, even if we assume with appellant that it is the owner of the trademark "Timken" in the trade areas allocated to the British and French corporations. Appellant's premise that the trade restraints are only incidental to the trademark contracts is refuted by the District Court's finding that the "trade mark provisions [in the agreements] were subsidiary and secondary to the central purpose of allocating trade territories." Furthermore, while a trademark merely affords protection to a name, the agreements in the present case went far beyond protection of the name "Timken" and provided for control of the manufacture and sale of antifriction bearings

whether carrying the mark or not. A trademark cannot be legally used as a device for Sherman Act violation. Indeed, the Trade Mark Act of 1946 itself penalizes use of a mark "to violate the antitrust laws of the United States." [8]

We also reject the suggestion that the Sherman Act should not be enforced in this case because what appellant has done is reasonable in view of current foreign trade conditions. The argument in this regard seems to be that tariffs, quota restrictions and the like are now such that the export and import of antifriction bearings can no longer be expected as a practical matter; that appellant cannot successfully sell its American-made goods abroad; and that the only way it can profit from business in England, France and other countries is through the ownership of stock in companies organized and manufacturing there. This position ignores the fact that the provisions in the Sherman Act against restraints of foreign trade are based on the assumption, and reflect the policy, that export and import trade in commodities is both possible and desirable. Those provisions of the Act are wholly inconsistent with appellant's argument that American business must be left free to participate in international cartels, that free foreign commerce in goods must be sacrificed in order to foster export of American dollars for investment in foreign factories which sell abroad. Acceptance of appellant's view would make the Sherman Act a dead letter insofar as it prohibits contracts and conspiracies in restraint of foreign trade. If such a drastic change is to be made in the statute, Congress is the one to do it.

[8] 60 Stat. 427, 439, § 33 (b) (7), 15 U. S. C. §§ 1051, 1115 (b) (7). The reason for the penalty provision was that "trade-marks have been misused. . . . have been used in connection with cartel agreements." 92 Cong. Rec. 7872.

Finally, appellant attacks the District Court's decree as being too broad in scope. The decree enjoins continuation or repetition of the conduct found illegal. This is clearly correct. *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436, 461. It also contains certain other restraining provisions which were within the court's discretion because "relief, to be effective, must go beyond the narrow limits of the proven violation." *United States* v. *United States Gypsum Co.*, 340 U. S. 76, 90. The most vigorous objection, however, is made to those portions of the decree relating to divestiture of appellant's stockholdings and other financial interests in British and French Timken.

MR. JUSTICE DOUGLAS, MR. JUSTICE MINTON and I believe that the decree properly ordered divestiture. Our views on this point are as follows: Appellant's interests in the British and French companies were obtained as part of a plan to promote the illegal trade restraints. If not severed, the intercompany relationships will provide in the future, as they have in the past, the temptation and means to engage in the prohibited conduct. These considerations alone should be enough to support the divestiture order. *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 152–153; *United States* v. *National Lead Co.*, 332 U. S. 319, 363. But there are other considerations as well. The decree should not be overturned unless we can say that the District Court abused its discretion. Absent divestiture, it is difficult to see where other parts of the decree forbidding trade restraints would add much to what the Sherman Act by itself already prohibits.[9] And obviously the most effec-

---

[9] We would reject the argument that divestiture is unwise in light of current foreign trade conditions for substantially the same reasons we rejected it in connection with appellant's contention that there was no violation of the Sherman Act.

tive way to suppress further Sherman Act violations is to end the intercorporate relationship which has been the core of the conspiracy. For these reasons, MR. JUSTICE DOUGLAS, MR. JUSTICE MINTON and I cannot say that the District Court abused its discretion in ordering divestiture.[10]

Nevertheless, a majority of this Court, for reasons set forth in other opinions filed in this case, believe that divestiture should not have been ordered by the District Court. Therefore, it becomes necessary to strike from the decree §§ VIII, IVB, and the phrase "or B" in § IVC. As so modified, the judgment of the District Court is affirmed.

*It is so ordered.*

MR. JUSTICE BURTON and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE REED, with whom THE CHIEF JUSTICE joins, concurring.

It seems to me there can be no valid objection to that part of the opinion which approves the finding of the District Court that the Timken Roller Bearing Company has violated §§ 1 and 3 of the Sherman Act. It may seem

---

[10] Dewar died while this appeal was pending. Were it not for the present litigation, appellant, under the contracts between it and Dewar, would be entitled to purchase Dewar's interest in British Timken (which would give appellant a 54% stock interest in that corporation); appellant also has a right of first refusal as to Dewar's 50% stock interest in French Timken (which, if exercised, would give appellant 100% ownership of that company). Appellant moved in the District Court to reopen the record to admit evidence of these changed circumstances caused by Dewar's death and for a reconsideration of the divestiture provisions of the decree. The District Court denied the motion. MR. JUSTICE DOUGLAS, MR. JUSTICE MINTON and I would hold that this ruling was within its discretion.

strange to have a conspiracy for the division of territory for marketing between one corporation and another in which it has a large or even a major interest, but any other conclusion would open wide the doors for violation of the Sherman Act at home and in foreign fields. My disagreement with the opinion is based on the suggested requirement that American Timken divest itself of all interest in British Timken and French Timken as required by paragraph VIII of the decree set out below.[1] My reasons for this disagreement follow.

There are no specific statutory provisions authorizing courts to employ the harsh remedy of divestiture in civil proceedings to restrain violations of the Sherman Act. Fines and imprisonment may follow criminal convictions, 15 U. S. C. § 1, and divestiture of property has been used

---

[1] "VIII. A. Within two years from the date of this judgment, defendant shall divest itself of all stock holdings and other financial interests, direct or indirect, in British Timken and French Timken. Within one year from the date of this judgment, defendant shall present to the Court for its approval a plan for such divestiture.

"B. Defendant is hereby enjoined and restrained, from the date of this judgment, from:

"1. Acquiring, directly or indirectly, any ownership interest in (by purchase or acquisition of assets or securities, or through the exercise of any option, or otherwise), or any control over, British Timken or French Timken, or any subsidiary, successor or assign thereof;

"2. Exercising any influence or control over the production, sales or other business policies of British Timken or French Timken, or any subsidiary, successor, assign, agent, sales representative, or distributor thereof;

"3. Causing, authorizing or knowingly permitting any officer, director, or employee of defendant or its subsidiaries to serve as an officer, director, or employee of British Timken or French Timken or of any subsidiary, successor, assign, agent, sales representative, or distributor thereof."

in decrees, not as punishment, but to assure effective enforcement of the laws against restraint of trade.[2]

Since divestiture is a remedy to restore competition and not to punish those who restrain trade, it is not to be used indiscriminately, without regard to the type of violation or whether other effective methods, less harsh, are available. That judicial restraint should follow such lines is exemplified by our recent rulings in *United States* v. *National Lead Co.*, 332 U. S. 319, where we approved divestiture of some properties belonging to the conspirators and denied it as to others, pp. 348–353. While the decree here does not call for confiscation, it does call for divestiture. I think that requirement is unnecessary.[3]

In this case the prohibited plan grew out of the effort to implement a patent monopoly. The difficulties of cultivating a foreign market for our manufactured goods obviously entered into creation of the British and French companies so as to enjoy a right of distribution into areas where otherwise restrictions, because of tariffs, quotas and exchange, might be expected. We fail to see such propensity toward restraint of trade as is evidenced in the *Crescent* case.

What we have is an American corporation, dominant in the field of tapered roller bearings, producing between 70 and 80 percent of the American output. In 1947 its gross sales were over $77,000,000. This is a distinctive type of bearing, competing successfully for adoption by industry with other antifriction bearings. Timken pro-

---

[2] *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 189; *United States* v. *Paramount Pictures*, 334 U. S. 131, 166 (Third); 85 F. Supp. 881, 895, affirmed *sub nom. United States* v. *Loew's, Inc.*, 339 U. S. 974; *United States* v. *Aluminum Co. of America*, 91 F. Supp. 333, 392 (Aluminum Limited) at 418–419.

[3] Cf. *Hartford-Empire Co.* v. *United States*, 323 U. S. 386, 413 *et seq.*

duces about 25% of all United States antifriction bearings. As there were no findings of facts tending to show violation of the Sherman Act otherwise than through formal agreements for partition of territory, we assume appellant's conduct was otherwise lawful.

In such circumstances, there was, of course, no occasion for the lower court to order any splitting up of a consolidated entity. Cf. *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106. There has been no effort to create numerous smaller companies out of Timken so that there will be no dominant individual in the tapered roller bearing field. The American company had had a normal growth and development. Its relations with English and French Timken were close and American Timken had stock and contracts for further stock in both foreign companies of value in the development of its foreign business. Such business arrangements should not be destroyed unless necessary to do away with the prohibited evil.

An injunction was entered by the District Court to prohibit the continuation of the objectionable contracts. Violation of that injunction would threaten the appellant and its officers with civil and criminal contempt. *United States* v. *Goldman,* 277 U. S. 229, and *Hill* v. *Weiner,* 300 U. S. 105. The paucity of cases dealing with contempt of Sherman Act injunctions is, I think, an indication of how carefully the decrees are obeyed. The injunction is a far stronger sanction against further violation than the Sherman Act alone. Once in possession of facts showing violation, the Government would obtain a quick and summary punishment of the violator. Furthermore this case remains on the docket for the purpose of "enforcement of compliance" and "punishment of violations." This provision should leave power in the court to enforce divestiture, if the injunction alone fails. Prompt and full compliance with the decree should be anticipated.

This Court is hesitant, always, to interfere with the scope of the trial court's decree.[4] However, in this case it seems appropriate to indicate my disapproval of the requirement of divestiture and to suggest a direction to the District Court that provisions leading to that result be eliminated from the decree. Such remand would also give opportunity for reconsideration of the changes necessary in the decree because of the remand and the death of Mr. Dewar.

In my view such an order should be entered.

MR. JUSTICE FRANKFURTER, dissenting.

The force of the reasoning against divestiture in this case fortifies the doubts which I felt about the Government's position at the close of argument and persuades me to associate myself, in substance, with the dissenting views expressed by MR. JUSTICE JACKSON. Even "cartel" is not a talismanic word, so as to displace the rule of reason by which breaches of the Sherman Law are determined. Nor is "division of territory" so self-operating a category of Sherman Law violations as to dispense with analysis of the practical consequences of what on paper is a geographic division of territory.

While *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, presented a wholly different set of facts from those before us, the decision in that case does point to the fact that the circumstances of foreign trade may alter the incidence of what in the setting of domestic commerce would be a clear case of unreasonable restraint of trade.

Of course, it is not for this Court to formulate economic policy as to foreign commerce. But the conditions controlling foreign commerce may be relevant here. When as a matter of cold fact the legal, financial, and governmental policies deny opportunities for exportation from

---

[4] See *United States* v. *United States Gypsum Co.,* 340 U. S. 76, 89.

this country and importation into it, arrangements that afford such opportunities to American enterprise may not fall under the ban of a fair construction of the Sherman Law because comparable arrangements regarding domestic commerce come within its condemnation.

MR. JUSTICE JACKSON, dissenting.

I doubt that it should be regarded as an unreasonable restraint of trade for an American industrial concern to organize foreign subsidiaries, each limited to serving a particular market area. If so, it seems to preclude the only practical means of reaching foreign markets by many American industries.

The fundamental issue here concerns a severely technical application to foreign commerce of the concept of conspiracy. It is admitted that if Timken had, within its own corporate organization, set up separate departments to operate plants in France and Great Britain, as well as in the United States, "that would not be a conspiracy. You must have two entities to have a conspiracy."[1] Thus, although a single American producer, of course, would not compete with itself, either abroad or at home, and could determine prices and allot territories with the same effect as here, that would not be a violation of the Act, because a corporation cannot conspire with itself. Government counsel answered affirmatively the question of the Chief Justice: "Your theory is that if you have a separate corporation, that makes the difference?"[2] Thus, the Court applies the well-established conspiracy doctrine that what it would not be illegal for Timken to do alone may be illegal as a conspiracy when done by two legally separate persons. The doctrine now applied to foreign commerce is that foreign subsidiaries organized by an

---

[1] Argument of government counsel reported 19 L. W. 3291 *et seq.*
[2] See note 1, *supra.*

American corporation are "separate persons," and any arrangement between them and the parent corporation to do that which is legal for the parent alone is an unlawful conspiracy. I think that result places too much weight on labels.

But if we apply the most strict conspiracy doctrine, we still have the question whether the arrangement is an unreasonable restraint of trade or a method and means of carrying on competition in trade. Timken did not sit down with competitors and divide an existing market between them. It has at all times, in all places, had powerful rivals. It was not effectively meeting their competition in foreign markets, and so it joined others in creating a British subsidiary to go after business best reachable through such a concern and a French one to exploit French markets. Of course, in doing so, it allotted appropriate territory to each and none was to enter into competition with the other or with the parent. Since many foreign governments prohibit or handicap American corporations from owning plants, entering into contracts, or engaging in business directly, this seems the only practical way of waging competition in those areas.

The philosophy of the Government, adopted by the Court, is that Timken's conduct is conspiracy to restrain trade solely because the venture made use of subsidiaries. It is forbidden thus to deal with and utilize subsidiaries to exploit foreign territories, because "parent and subsidiary corporations must accept the consequences of maintaining separate corporate entities," [3] and that consequence is conspiracy to restrain trade. But not all agreements are conspiracies and not all restraints of trade are unlawful. In a world of tariffs, trade barriers, empire or domestic preferences, and various forms of parochialism from which we are by no means free, I think a rule that it

[3] See note 1, *supra*.

608

is restraint of trade to enter a foreign market through a separate subsidiary of limited scope is virtually to foreclose foreign commerce of many kinds. It is one thing for competitors or a parent and its subsidiaries to divide the United States domestic market which is an economic and legal unit; it is another for an industry to recognize that foreign markets consist of many legal and economic units and to go after each through separate means. I think this decision will restrain more trade than it will make free.