**In the Matter of Clarence Christman COX, Bankrupt.**

**No. 2296.**

United States District Court
W. D. Missouri,
Central Division.

Aug. 25, 1965.

Don C. Carter, Sturgeon, Mo., for bankrupt.

Irving Achtenberg, Kansas City, Mo., Carroll N. Bryson, Centralia, Mo., Roger D. Hines, Columbia, Mo., for trustee and creditors.

JOHN W. OLIVER, District Judge.

The Referee's Certificate covers two petitions for review filed in the above case. In the first petition, the bankrupt seeks a review of that portion of the Referee's order of September 25, 1964 that sustained Specification 7 of the objections to discharge filed by The First National Bank of Centralia, Missouri.

The Trustee's petition seeks a review of that portion of the Referee's order that overruled the Trustee's objections to discharge. In its brief in this Court, the Trustee states that he is "content so long as any one specification [filed by either the Trustee or the First National

Bank of Centralia] is sustained and the discharge denied."

Counsel for all parties expressly waived a further hearing in this Court and agreed that we should rule this case on the record made before the Referee. Our study of that record convinced us that there is no reason to require, on our own motion, further evidence pursuant to the power vested by General Order in Bankruptcy No. 47.

Because we shall determine that the findings of fact made by the Referee are not clearly erroneous, and because we shall also determine that the Referee properly applied the law, all to the end that the Referee's order will be adopted, it will not be necessary to rule the Trustee's petition for review.

The Referee's finding of fact and conclusions of law were carefully and fully set forth in a 46 page memorandum opinion. In regard to Specification 7 of the objections filed by The First National Bank of Centralia, the Referee stated:

> In specification 7 of the Objections to Discharge filed by the First National Bank, Centralia, Missouri, it is alleged that "bankrupt has failed to list the names, addresses and amounts due and owing all of his creditors; that, on the contrary, he has failed to list a number of his creditors, among them the Hallsville State Bank on a promissory note in the amount of $2,300.00 executed on or about January 31, 1961."

After directing attention to Section 7, sub. a(8) and Section 14, sub. c(1) of the Bankruptcy Act, the Referee set forth the oath sworn to by the bankrupt in regard to Schedule A, the schedule in which a "Statement of All debts of Bankrupt" was required by law. The Referee then stated:

> Nowhere in this Schedule A is the Hallsville State Bank listed as a creditor. Further, there is no reference to the bank in any of bankrupt's schedules, petition in bankruptcy or statement of affairs, except that it is named, in answer to

Question 7a of the Statement of Affairs, as a bank in which bankrupt and his wife, Hattie J. Cox, maintained a joint account within the 2-year period preceding bankruptcy.

The failure to list or schedule all creditors, if knowingly and fraudulently done, is grounds for denying a discharge under Sec. 14, sub. c(1), supra. Stim v. Simon, (2 Cir., 1960) 284 F.2d 58; In re Schnabel, (D.C.Minn.1945) 61 F.Supp. 386; see also Jackson v. Menick, (9 Cir. 1959) 271 F.2d 806; In re Haydu, (D.C.N.Y.1952) 105 F.Supp. 859.

The following findings of fact were made by the Referee:

> The evidence shows, and I find the facts to be:
>
> On February 2, 1961, bankrupt and his wife, Hattie J. Cox, executed and delivered to The State Bank of Hallsville, Hallsville, Missouri, their demand promissory note for $2,-300.00, bearing interest at 6% per year (Cred.Exh. 4, Tr. 200, 202; Tr. 106; R. 87). $2,300.00 was due upon the principal amount of the note at bankrupcty. The debt is not scheduled by bankrupt as one of his debts in his Schedule A, filed on March 10, 1961 at the time of the filing of the petition in bankruptcy (Tr. 105; see also Schedule A, Objectors' Exh. 3, R. 23).
>
> This note was executed as the manifestation of a loan from the payee bank so that 9 head of Santa Gertrudis cattle, and 5 of such calves, could be purchased at a foreclosure sale being held on January 30, 1961, by the First National Bank of Mexico (Tr. 22, 23, 104, 105). Previously, these head of cattle and calves had been owned by bankrupt's son, Thomas T. Cox, who had financed the purchase of the Santa Gertrudis herd through the said First National Bank of Mexico, bankrupt having executed with his son a $10,000.00 note as a manifestation of that cattle loan (Tr. 22, 23,

85, 104, 125; R. 61–66, 95, 96, 103, 104).

Bankrupt made no claim of interest in these cattle testifying at the first meeting of creditors that his wife owned the cattle (Tr. 8, 21). To purchase the cattle, bankrupt's wife drew a check on January 31, 1961, for $2,290.00 on The State Bank of Hallsville (Exh. 11–A; R. 42–44, R. 86, 87), the payment of which was made out of the proceeds of a loan of $2,300.00 made by that bank for that purpose (R. 44, 87; Tr. 105, 106, 114, 132); the note of February 2, 1961, previously referred to is the evidence of that loan (R. 44, 87; Tr. 105, 106, 114, 132). Bankrupt and his wife both signed this note (Cred.Exh. 4, Tr. 200, 202). Since the purchase, the cattle have been feeding on pasture (Tr. 129), Mrs. Cox letting the "cattle pay for themselves" (Tr. 134).

Previous to this transaction, Mrs. Cox did not, during her marriage to the bankrupt, own any cattle except for one milk cow (or maybe two) which she owned from time to time. She brought one to the marriage, and replaced it from time to time as need occasioned. (R. 46; Tr. 121, 122, 125, 134).

After quoting particular testimony, the Referee continued as follows:

Bankrupt and his wife have been married for 43 years (Tr. 128); for the last 7 or 8 years, she's been "a sick woman, and I am not capable of doing anything on the farm" (Tr. 134). She categorized bankrupt as "the manager of the farm" (Tr. 134). She doesn't "know a thing about their business any more on the farm," no longer participates in any of the farming transactions, doesn't purchase crops or pay bills, and has no interest in the farming business except that of a housewife (Tr. 128). She doesn't draw checks for farm transactions (Tr. 129). She didn't know that a new checking account in the State Bank of Hallsville had been opened (Tr. 130)— all she knew was that she borrowed money from the bank to buy the cattle (Tr. 130). She made no claim to any interest in any of the farm equipment (Tr. 130, 131).

The Referee quoted the bankrupt's attempted explanations made of record for his failure to schedule The State Bank of Hallsville as a creditor, and then stated that:

Thus, the evidence clearly shows that bankrupt was indebted at bankruptcy to The State Bank of Hallsville on the note dated February 2, 1961, and that he failed to schedule the liability on his Schedule A. Was the omission knowingly and fraudulently made, or done? I believe that it was.

\* \* \* \* \* \*

The evidence shows that the debt to The State Bank of Hallsville was contracted some one month and ten days prior to bankruptcy; that its manifestation, in the form of the note, was executed only one month and eight days prior thereto; and that, save for the debt described in bankrupt's Schedule A–2 as the debt due Cottle Implement Co., Columbia, Missouri, it is the most newly created of all of bankrupt's liabilities. Further, as previously pointed out, the debt results from a transaction by which 14 head of Santa Gertrudis cattle were purchased prior to bankruptcy, either by bankrupt, or his wife, under circumstances which warrant a painstaking and thorough inquiry by bankrupt's creditors (or the trustee in bankruptcy in their stead) into the question of the exact nature of bankrupt's interest in those cattle. Bankrupt, and his wife, too, would have a trier of fact believe that the wife purchased those cattle, although by her own testimony her illness has prevented her taking any active interest in the farm's management or operation within the seven or eight years prior

to bankruptcy, and although she had never purchased cattle theretofore, even while hale and healthy, save for one-or-two milk cows which she owned from time to time during the marriage.

I believe that bankrupt failed to schedule the debt to the bank to prevent, or obstruct, an inquiry by his creditors and the court into the cattle transaction; this, I think, is the only fair inference to be drawn from all of the evidence. True, he did not succeed; nor did the bankrupt in the Aronofsky [Aronofsky v. Bostian] case, supra, [133 F.2d 290]; as did not the bankrupt in the Willoughby [Willoughby v. Jamison] case, supra [103 F.2d 821].

Bankrupt, when asked several times why the debt was not scheduled, either didn't know why it wasn't listed, or said it wasn't because his wife owed the money and that there wasn't any equity in the cattle. These purported explanations are none at all. And, bankrupt's failure to schedule the debt in his Schedule A, which is verified, constitutes under the circumstances, in my opinion, the making knowingly and fraudulently of a false oath in or in relation to a bankruptcy proceeding. See also Stim v. Simon, supra (284 F.2d 58), and Jackson v. Menick, supra, (271 F.2d 806).

Accordingly, Specification 7 of the Objections To Discharge filed by The First National Bank, Centralia, Missouri, is to be sustained by the order being prepared this date for filing and therefore, bankrupt's discharge will be denied.

In this Court the bankrupt argues that "the meager evidence" in this case is insufficient "to prove any offense committed by the bankrupt." The bankrupt also argues that "the evidence showed conclusively that he [the bankrupt] had no reason whatsoever to have omitted the Bank of Hallsville as a creditor in his Schedules * * *". Those arguments, of course, are made on the faulty assumption that it is our duty to try this case *de novo* on the record made before the Referee.

It is not our duty to try this case *de novo*; nor can we, in the usual sense of those words, weigh the evidence in order to make findings of fact independent of those found by the Referee.

General Order in Bankruptcy No. 47 requires that we must accept the findings of fact of the Referee unless we find them to be "clearly erroneous." Such is the scope of our narrow and restricted power of review.

Chief Judge Devitt in In re Beedle-Whiton Co., (D.C.Minn.1955) 132 F. Supp. 558 at 560, states the proper point of beginning for a review of a referee's findings of fact by a District Court as follows:

The scope of review of the Referee's findings of fact is strictly limited by General Order in Bankruptcy No. 47, which provides that:

"Unless otherwise directed in the order of reference, the report of a referee * * * shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous * * *"

The Referee's findings are not clearly erroneous when they are supported by substantial evidence.

The Court of Appeals for the Eighth Circuit carefully outlined its construction of General Order in Bankruptcy No. 47 in two cases decided shortly after its 1939 promulgation. In Equitable Life Assurance Society of United States v. Carmody, (8 Cir. 1942) 131 F.2d 318, at 322, Judge Johnsen held:

Under Order 47, General Orders in Bankruptcy, as effective February 13, 1939, 11 U.S.C.A. following section 53, the District Judge was not charged with the duty of trying the facts de novo on the record presented to him and of making independ-

ent findings thereon. His obligation in the present situation was merely to review, in a sound manner, the action and findings of the Conciliation Commissioner [a Conciliation Commissioner is a "referee" within the meaning of Order 47] in the light of all the factors that properly were involved in the original hearing, and, as to any challenged finding of fact, to ascertain from the record whether such finding was clearly erroneous on the basis of a soundly restrained judicial conscience and controlling legal principles.

Carmody makes clear that it is immaterial that the District Judge, "if he were trying the case *de novo* on the record without regard to the questions of weight or credibility involved in the original hearing * * * would have differed with the view" of the referee; indeed, in that case, the District Judge had indicated quite clearly that he would have, except for General Order 47, differed from the Conciliation Commissioner's judgment.

In Equitable Life Assur. Soc. of United States v. Deutschle, (8 Cir. 1942), 132 F.2d 525 at 526, our controlling court added that "[i]t is settled by numerous authorities that when the findings of a referee in bankruptcy * * * are supported by substantial evidence they are not 'clearly erroneous' within the meaning of General Order No. 47 * * *". See further Teasdale v. Prosperity Company, (8 Cir. 1961) 290 F.2d 345 at page 348, the most recent Eighth Circuit case in which the same "settled rule" is stated, and in which the intervening Eighth Circuit cases are collected and cited. And see also In re Stine, E.D.Mo.1945, 60 F.Supp. 703, and In re Leach, W.D.Ark.1961, 197 F.Supp. 513, for examples of District Courts of the Eighth Circuit making application of the scope of review just stated in cases involving orders of a Referee that related to the discharge of a bankrupt.

We are familiar with the fact that in some of the cases decided between Car-

mody and Prosperity Company there is language to the general effect that "[a] finding of fact * * * is not clearly erroneous unless it is (1) unsupported by substantial evidence, (2) *contrary to the clear weight of the evidence,* or (3) induced by an erroneous view of the law." [Emphasis ours; quoted from Gasifier Mfg. Co. v. General Motors Corporation, (8 Cir. 1943) 138 F.2d 197 at 199].

The language of that case, which was a patent case involving a finding of a district judge, paraphrased the substance of Judge Johnsen's opinion in Dunsdon v. Federal Land Bank of St. Paul, (8 Cir. 1943) 137 F.2d 84 at 86. The Dunsdon case was a bankruptcy case and its language and the language of Gasifier Mfg. Co. was quoted or paraphrased in other bankruptcy cases decided between Carmody and Prosperity Company. See, for example Kauk v. Anderson, (8 Cir. 1943) 137 F.2d 331 at 333; State of North Dakota v. Szarkowski, (8 Cir. 1944) 142 F.2d 333 at 336; Link v. Boeshans, (8 Cir. 1945) 151 F.2d 322 at 324 and Boyce v. Chemical Plastics, (8 Cir. 1949) 175 F.2d 839 at 841. And compare In re Woerderhoff Shoe Co., N.D.Iowa 1960, 184 F.Supp. 479 at 482.

Judge Johnsen, however, made clear in Rhodes v. Federal Land Bank of St. Paul, (8 Cir. 1944) 140 F.2d 612 at 613–614, that "the district judge, on petition for review, does not have the right to try [contested issues of fact] *de novo* on the record, merely because he disagrees with the [referee] on the weight to which the conflicting, but substantial, competent and credible, evidence of the witnesses is entitled."

Both Rule 52(a) of the Rules of Civil Procedure and General Order No. 47 contain the same "clearly erroneous" standard. Rait v. Federal Land Bank of St. Paul, (8 Cir. 1943) 135 F.2d 447 at 451, intimates that the standard to be applied by a District Court in a review of a referee's findings of fact under General Order No. 47 is the same standard that a Court of Appeals applies under Rule 52

(a) when it reviews the findings of fact of the District Court.

Since United States v. United States Gypsum Co., 333 U.S. 364 at 395, 68 S.Ct. 525 at 542, 92 L.Ed. 746 (1948), the Supreme Court has repeatedly and consistently held in a variety of cases that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." And United States v. National Ass'n of Real Estate Boards, 339 U.S. 485 at 495, 70 S.Ct. 711 at 717, 94 L.Ed. 1007 (1950) teaches further that "[i]t is not enough [to support "a definite and firm conviction that a mistake has been committed"] that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent." The Supreme Court cases establish beyond doubt that the "clearly erroneous" language of Rule 52(a) prohibits the reviewing court from trying the case *de novo*. See, for example, Timken Roller Bearing Co. v. United States, 341 U.S. 593 at 597, 71 S.Ct. 971, 95 L. Ed. 1199 (1951), and United States v. E. I. DuPont De Nemours & Co., 351 U.S. 377 at 381, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). See also McAllister v. United States, 348 U.S. 19 at 21, 75 S.Ct. 6, 99 L.Ed. 20 (1954) applying the "clearly erroneous" rule to admiralty cases, and Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278 at 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960) applying, pursuant to express Congressional mandate, the "clearly erroneous" rule to decisions of the Tax Court.

We do not read the interim cases decided between Carmody in 1943 and Prosperity Company in 1961 that suggest that a referee's findings of fact are "clearly erroneous" if unsupported by substantial evidence or if *"contrary to the clear weight of the evidence,"* as suggesting any different standard of review than that provided by the same "clearly erroneous" language of Rule 52

(a) as explained by the Supreme Court cases to which we have referred.

The problem of semantics is an obvious one and one that has been judicially recognized. Judge Soper, for example, in his concurring opinion in National Labor Relations Board v. Southland Mfg. Co., (4 Cir. 1952) 201 F.2d 244 at 250, noted the apparent difference between the "clearly erroneous" standard of Rule 52(a) and the statutory standard that the findings of an administrative body are to be accepted "if supported by substantial evidence on the record considered as a whole." We quite agree with Judge Soper that "[t]he mental processes of the reviewing authority which are called into action in each situation are so similar that they can hardly be distinguished."

■ We are convinced that the polestar from which the reviewing authority obtains its guidance for application of the "clearly erroneous" standard is the easily stated and easily applied concept that the review provided is not a *de novo* review. It is easier to state what Rule 52(a) and General Order No. 47 prohibit than to state what they require.

We also believe, however, that the somewhat general and admittedly relative statement of Gypsum that the reviewing authority must be left with "a definite and firm conviction that a mistake has been committed" before it may hold a factual finding to be "clearly erroneous" is but another way of expressing the identical idea that a finding of fact should be held to be "clearly erroneous" if it is not "supported by substantial evidence" and that the evidence in a particular case should be held to be not "substantial" if it is "contrary to the clear weight of the evidence."

Fortunately there is much more difficulty in stating than in applying the rule that is designed both to afford the guidelines for the scope of review and to describe an appellate process that is something less than a *de novo* appeal. When particular cases are presented for decision, the way to ultimate determination

seems to open—a "definite and firm conviction" is formulated—in a manner not inconsistent with the exercise of any other discharge of judicial duty. Perhaps, Mr. Justice Holmes' comment about experience and logic is applicable to this aspect of judicial administration.

The application of General Order No. 47 to this case is not a difficult task. It is our duty to ascertain whether or not the findings of fact by the Referee are clearly erroneous and to determine whether the Referee made proper application of the controlling law.

■ A careful review of the evidence requires that we hold that the findings of fact of the Referee are not clearly erroneous and that therefore they should be accepted under the command of General Order No. 47. We find and determine that the inferences drawn from the evidence are fully warranted. It is academic whether we would have drawn the same inferences had we had the benefit of hearing the witnesses, but, on the basis of the cold record (a sometimes not too certain guide), we are inclined to think that we would have drawn exactly the same inferences as were drawn by the Referee.

The memorandum opinion of the Referee demonstrates that he made application of the controlling law. Paragraph 14.28 1 Collier on Bankruptcy, 14th Edition, 1346 states the following:

> The bankrupt's schedule of debts is accompanied by his verified statement that the schedule "is a statement of all my debts." Consequently he is guilty of a false oath and may be denied a discharge by knowingly and fraudulently omitting the name of a creditor from this schedule.

Judge Nordbye's opinion in In re Schnabel, D.C.Minn.1945, 61 F.Supp. 386, is cited by Collier in support of the quoted rule of decision. That case is precisely in point and the referee's memorandum (which Judge Nordbye adopted) correctly analyzed the earlier Eighth Circuit cases of Willoughby v. Jamison, (8 Cir. 1939) 103 F.2d 821, and Aronofsky v. Bostian, (8 Cir. 1943) 133 F.2d 290.

■ The most recent case is Stim v. Simon, (2 Cir. 1960) 284 F.2d 58. That case reversed a District Court that refused to accept the factual findings of a referee who had found that the bankrupt had, in fact, knowingly and fraudulently failed to list all his creditors in Schedule A. The case pointed out, we believe correctly, that "[t]he making of findings of fact on disputed testimony is the primary function of the referee, and under General Order in Bankruptcy No. 47, 11 U.S.C.A. following section 53, the judge is required to accept the referee's findings of fact unless they are 'clearly erroneous'" (284 F.2d at 60). Compare Jackson v. Menick, (9 Cir. 1959) 271 F. 2d 806, in which the District Court's adoption of the referee's denial of discharge, based in part on a failure to list all creditors, was affirmed. See In re Zidoff, (7 Cir. 1962) 309 F.2d 417, for a similar affirmance of a District Court's adoption of a referee's denial of discharge based solely on the omission of five creditors from Schedule A. And see also In re Tabibian, (2 Cir. 1961) 289 F.2d 793, in which a District Court was reversed when it refused to adopt the findings of the referee that the bankrupt had not "knowingly and fraudulently" made a false oath.

The latter case explained the rationale upon which the "clearly erroneous" standard of review is based. It points out that the findings of the referee, rather than the contrary finding of the District Judge, should be accepted because the former "observed Tabibian [the bankrupt] on the stand and had by far the best vantage point from which to measure the good faith of the bankrupt" (289 F.2d at 797).

The referee in this case, as all referees in similar cases, occupied the same vantage point; his findings of fact are supported by substantial evidence and by the apparently clear weight of the evidence; certainly we can not say on this record that those findings are "clearly

erroneous". The referee correctly applied the law as stated in the cases to which we have referred. It follows that his denial of the bankrupt's discharge should be sustained.

For the reasons stated, the order of the Referee of September 25, 1964 denying discharge should be and is hereby adopted and confirmed.

It is so ordered.