SOTOMAYOR, Circuit Judge,
concurring in the judgment:
I concur fully in the judgment. I write separately because I believe the majority endorses an overly formalistic view of price fixing and in so doing avoids addressing directly the central contention of appellant Salvino, Inc. (“Salvino”) that the exclusive arrangement between the Major League Baseball clubs (the “Clubs”) and Major League Baseball Properties, Inc. (“MLBP”) removes all price competition between the Clubs on the licensing of intellectual property in violation of the Sherman Act, 15 U.S.C. § 1. Further, while I agree with the ultimate outcome of this appeal, I reach my conclusion using a different framework than the majority, applying the doctrine of ancillary restraints, which I believe more efficiently addresses the issues presented here.
Before applying this framework, however, I address the majority’s flawed view that the Clubs have made no agreement on *335 price.[1] It is undisputed that the Clubs have agreed through the exclusivity and profit-sharing clauses in the MLBP agreement not to compete with each other on the sale of trademark licenses. Instead, they have agreed to give MLBP the sole authority to set prices for all Major League Baseball licenses and to share equally in the proceeds from those licensing sales.[2] While the MLBP agreement does not specify a price to be charged, the effect of the agreement clearly eliminates price competition between the Clubs for trademark licenses. An agreement to eliminate price competition from the market is the essence of price fixing. See, e.g., United States v. Container Corp. of Am., 393 U.S. 333, 337, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).
Nevertheless, the majority contends that this “so-called ‘price’ restriction is not in fact an agreement on ‘price’ but rather an agreement for the sharing of profits.” Maj. Op. at 319; see also id. at 318-20 (Part II.C.2). Were the majority correct, competing companies could evade the antitrust laws simply by creating a “joint venture” to serve as the exclusive seller of their competing products. So long as no agreement explicitly listed the prices to be charged, the companies could act as monopolists through the “joint venture,” setting prices together for their competing products, because the majority would categorize these actions formalistically as only an agreement to share profits. The antitrust laws are not so rigid as to permit such easy evasion.
Explicit price agreements have long been unnecessary for a price restraint to be per se unlawful. See, e.g., United States v. Gen. Motors Corp., 384 U.S. 127, 142-43, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Am. Tobacco Co. v. United States, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). Indeed, the mere agreement among competitors to exchange price information is a per se price-fixing violation. See Container Corp., 393 U.S. at 334-38, 89 S.Ct. 510; see also, e.g., Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 650, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (per curiam) (holding agreement among wholesale beer sellers to make retailers pay in cash was per se illegal); Nat’l Soc’y of Prof'l Eng’rs v. United States, 435 U.S. 679, 692-93, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (holding agreement among engineers to refuse to discuss prices with potential customers until after the initial selection of an engineer was per se illegal); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222-24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (holding agreement among competitors to buy surplus gasoline was per se illegal). The majority’s analysis is at odds with this precedent because the majority appears to require an agreement explicitly indicating a price before that agreement may be considered a *336 per se illegal price restraint.[3] No such rigid requirement is necessary.
The law remains that any “combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.” Socony-Vacuum Oil Co., 310 U.S. at 223, 60 S.Ct. 811. Thus, the antitrust laws prohibit two companies A and B, producers of X, from agreeing to set the price of X. Likewise, A and B cannot simply get around this rule by agreeing to set the price of X through a third-party intermediary or “joint venture” if the purpose and effect of that agreement is to raise, depress, fix, peg, or stabilize the price of X. See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (“Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a ‘joint venture.’”), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); see also Federal Trade Comm’n & U.S. Dep’t of Justice, Antitrust Guidelines for Collaborations Among Competitors 9 (2000) (“[Ljabeling an arrangement a ‘joint venture’ will not protect what is merely a device to raise price or restrict output. ...”). In other words, an agreement between competitors to “share profits” or to make a third party the exclusive seller *337 of their competing products that has the purpose and effect of fixing, stabilizing, or raising prices may be a per se violation of the Sherman Act, even if no explicit price is referenced in the agreement.
The present dispute is significantly more complex than two competitors creating a “joint venture” for the sole purpose of fixing prices. Here, the MLBP joint venture offers substantial efficiency-enhancing benefits that the individual Clubs could not offer on their own, including decreased transaction costs on the sale of licenses, lower enforcement and monitoring costs, and the ability to one-stop shop (i.e., to purchases licenses from more than one Club in a central location). These procom-petitive benefits, MLBP maintains, could not exist without the exclusivity and profit-sharing agreements, the two provisions challenged by Salvino as price fixing. In other words, MLBP argues that even if the effect of the exclusivity and profit-sharing agreements is to eliminate price competition between the Clubs, the purpose of these agreements is to achieve other significant procompetitive benefits, which outweigh any harm from the price restraint.[4] We must decide then whether the Clubs’ agreement not to compete with each other on price, which is price fixing in a literal sense, should nevertheless be reviewed under a rule of reason in light of MLBP’s other efficiency-enhancing benefits. See Texaco Inc. v. Dagher, 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006); Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 8-9, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (rejecting application of the per se rule to every situation where there is literal price fixing because “[ljiter-alness is overly simplistic and often over-broad” and explaining that “ ‘price fixing’ is a shorthand way of describing certain categories of business behavior to which the per se rule has been held applicable”). For the reasons described below, I join with the majority in concluding that neither a per se nor a quick-look approach is appropriate here, but I apply a substantially different framework than the majority in reaching my conclusion.[5]
Recognizing that joint ventures “hold the promise of increasing a firm’s efficiency and enabling it to compete more effectively,” the Supreme Court has concluded that joint ventures should normally be analyzed under a rule of reason, requiring an inquiry into market power and structure and the actual effects of any restraints on trade. Copperweld Corp., 467 U.S. at 768, 104 S.Ct. 2731; see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 295-98, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (same). “While joint ventures have no immunity from the antitrust laws ..., a joint selling arrangement may ‘mak[e] possible a new product by reaping otherwise unattainable efficiencies.’ ” NCAA v. Bd. of Regents, 468 U.S. 85, 113, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Accordingly, competitors engaged in joint ventures may be permitted to engage in a variety of activities that would normally be illegal under a per se rule when such activities are necessary to achieve the significant efficiency-enhancing purposes of the venture. For *338 example, price fixing between competitors — generally a per se illegal restraint— may be justifiable in certain circumstances when done as part of a joint venture. See Broad. Music, 441 U.S. at 23, 99 S.Ct. 1551. In short, to protect the efficiency-enhancing potential of joint ventures and cooperatives, the rule of reason is the favored method of analysis for these ventures, preventing courts from intervening before a full market analysis is completed.
Nevertheless, a per se or quick-look approach may apply to joint ventures in at least two situations: (1) where a joint venture is essentially a sham, offering no reasonable prospect of any efficiency-enhancing benefit to society, see Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 52 (1st Cir.1998); and (2) where a particular challenged restraint is not reasonably necessary to achieve any of the efficiency-enhancing benefits of a joint venture and serves only as naked restraint against competition, see Polk Bros., Inc. v. Forest City Enters., Inc., 776 F.2d 185, 188-89 (7th Cir.1985). In such cases, a court may conclude that a joint venture or a challenged restraint is per se illegal where it has “manifestly anticompetitive effects.” See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., — U.S. —, 127 S.Ct. 2705, 2713, 168 L.Ed.2d 623 (2007) (internal quotation marks omitted).
Because MLBP offers significant pro-competitive benefits, Salvino does not seriously contend that MLBP as a whole is so manifestly anticompetitive that it should be considered a sham cartel. Cf. Palmer v. BRG of Ga., Inc., 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam) (holding an agreement between bar review course providers dividing market territories and sharing revenue was a per se violation). Rather, Salvino argues for a per se or quick-look approach under the second scenario, maintaining that the exclusivity and profit-sharing provisions of the MLBP agreement are not necessary to achieve any of MLBP’s procompetitive advantages and serve no purpose but to stifle competition. As Salvino explains, “Without the exclusivity requirement, potential licensees would have the freedom to either seek out each team for individualized arrangements or deal with all teams through the centralized agency of MLBP.” Accordingly, Salvino asks us to separate these two provisions from the rest of the joint venture and to conclude that they are so plainly anticompetitive as to be per se illegal. Because the provisions are reasonably necessary to achieve MLBP’s efficiency-enhancing objectives, I conclude that they should be analyzed as part of the joint venture using a rule-of-reason analysis.
Joint ventures are typically evaluated as a whole under the rule of reason because the competitive effects of an individual restraint are intertwined with the effects of the remainder of the venture. However, under the doctrine of ancillary restraints, when a challenged restraint is not reasonably necessary to achieve any of the efficiency-enhancing purposes of a joint venture, it will be evaluated apart from the rest of the venture. See, e.g., Freeman v. San Diego Ass’n of Realtors, 322 F.3d 1133, 1151 (9th Cir.2003); SCFC ILC, Inc. v. Visa USA, Inc., 36 F.3d 958, 970 (10th Cir.1994); Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 224 (D.C.Cir.1986); Polk Bros., 776 F.2d at 189; In re Polygram Holding, Inc., Docket No. 9298, 2003 WL 21770765 (F.T.C.2003). See generally Federal Trade Comm’n & U.S. Dep’t of Justice, Antitrust Guidelines for Collaborations Among Competitors (2000); Gregory J. Werden, Antitrust Analysis of Joint Ventures: An Overview, 66 Antitrust L.J. 701 (1998). This doctrine seeks to distinguish between those restraints that are intended to pro *339 mote the efficiencies of a joint venture and those that are simply unrelated.[6] As the Seventh Circuit explained:
A court must distinguish between “naked” restraints, those in which the restriction on competition is unaccompanied by new production or products, and “ancillary” restraints, those that are part of a larger endeavor whose success they promote. If two people meet one day and decide not to compete, the restraint is “naked”; it does nothing but suppress competition. If A hires B as a salesman and passes customer lists to B, then B’s reciprocal covenant not to compete with A is “ancillary.” At the time A and B strike their bargain, the enterprise (viewed as a whole) expands output and competition by putting B to work. The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties. Covenants of this type are evaluated under the Rule of Reason as ancillary restraints, and unless they bring a large market share under a single firm’s control they are lawful.
Polk Bros., 776 F.2d at 188-89 (internal citation omitted). The doctrine recognizes that a restraint that is unnecessary to achieve a joint venture’s efficiency-enhancing benefits may not be justified based on those benefits. Accordingly, a challenged restraint must have a reasonable procom-petitive justification, related to the efficiency-enhancing purposes of the joint venture, before that restraint will be analyzed as part of the venture. If none exists, the challenged restraint must be evaluated on its own and may be per se illegal even if the remainder of the joint venture is entirely lawful.[7] Cf. Blackburn v. Sweeney, 53 F.3d 825, 828-29 (7th Cir.1995) (applying the per se rule to a provision in a law partnership dissolution agreement that restrained the territories where former partners could advertise after finding the provision to be non-ancillary to the rest of the agreement). In contrast, where a restraint is reasonably necessary to achieve a joint venture’s efficiency-enhancing purposes (i.e., ancillary), it will be analyzed under the rule of reason as part of the joint venture because the effects of that restraint are not so plainly anticompetitive as to make a per se or quick-look approach appropriate.[8]
*340 In this case, the exclusivity and profit-sharing provisions of the MLBP agreement are reasonably necessary to achieve MLBP’s efficiency-enhancing purposes because they eliminate several potential ex-ternalities that may otherwise distort the incentives of individual Clubs and limit the potential efficiency gains of MLBP. See Fisher Report at 31-37. Most notable of these externalities is the so-called free-rider problem. Because of the interdependence of the Clubs within the setting of a sports league, free riding would occur if one of the Clubs is able to benefit disproportionately from the actions of Major League Baseball or other Clubs in the licensing of products. Id. at 32-35. This may lead to inefficiencies because the Clubs’ incentive to invest in the promotion and development of their intellectual property and other licensed products may be distorted. Id. Both MLBP and Salvino recognize that without the exclusivity and profit-sharing provisions, these externalities could diminish MLBP’s efficiency gains.[9] Indeed, Salvino’s own expert, Louis Guth, admitted in his deposition, when asked whether there would be more or less licenses without the centralized control of MLBP, that he could not give a straight yes or no answer without empirical analysis because of these potential ex-ternalities. See Guth Dep. at 135-37. In other words, Guth conceded that the challenged provisions could have a procompeti-tive impact related to the efficiency-enhancing purposes of MLBP.[10] Under such circumstances, the challenged restraints must be viewed as ancillary to the joint venture and reviewed under the rule of reason in the context of the joint venture as a whole.[11] See Rothery Storage, 792 F.2d at 228 (“[Elimination of the free ride is an efficiency justification available to horizontal restraints that are ancillary to a contract integration.”).
*341 The majority spends considerable time analyzing the similarities and differences between this case and Broadcast Music and NCAA, some of which I agree with and some of which I do not. However, I believe the ancillary restraints framework is a superior method for analyzing the challenged restraints here because it effectively isolates when an exclusive arrangement should be reviewed under the rule of reason, as a reasonably necessary part of a joint venture, and when it should be reviewed as a naked restraint. Neither Broadcast Music nor NCAA offer much direct insight into the treatment of exclusivity agreements, except to emphasize the anticompetitive dangers of exclusive arrangements. See Broad. Music, 441 U.S. at 23-24, 99 S.Ct. 1551 (emphasizing that “individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in such other markets”); NCAA, 468 U.S. at 114 n. 54, 104 S.Ct. 2948 (“Ensuring that individual members of a joint venture are free to increase output has been viewed as central in evaluating the competitive character of joint ventures.”). In my view, the exclusivity provision is the single most important distinguishing factor between this case and Broadcast Music, yet the majority offers little analysis of this distinction and no explanation as to how such an arrangement should be analyzed. Accordingly, while I ultimately agree with the majority that the rule of reason applies here, I reach my conclusion through a different path.
Having concluded that the rule of reason is appropriate in this case, I concur fully with the majority’s rule-of-reason analysis and agree that summary judgment was properly awarded to MLBP. See Maj. Op. at 332-33. On the present record, Salvino has adduced no evidence of an “actual adverse effect on competition as a whole in the relevant market,” Geneva Pharms. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 506-07 (2d Cir.2004) (internal quotation marks omitted). As such, its Sherman Act claims must fail. As noted by the majority, we need not and do not decide whether a successful Sherman Act claim could have been brought against MLBP with a properly supported record, including whether the procompetitive justifications for the two challenged provisions could be achieved in a substantially less restrictive manner.

. It is unclear how much weight the majority places on the lack of any explicit price or output restrictions, see Maj. Op. at 317-20 (Parts II.C.1-2), or whether it ultimately relies on the distinctions it draws between this case and Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), and NCAA v. Board of Regents, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), see Maj. Op. at 319-30 (Parts II.C.3-4), in reaching its conclusion that the rule of reason should apply.

. As noted by the majority, there are a few limited exceptions to the exclusivity agreement, including, for example, allowing Clubs to license their own trademarks on hot dogs and similar items sold within their home broadcasting territory. See Maj. Op. at 297-98. Notwithstanding these narrow exceptions, nearly all retail products containing the intellectual property of Major League Baseball or the Clubs must be licensed through MLBP.

. The majority also implies that MLBP's choice to set a royalty rate rather than a uniform price or "sum certain" is somehow less problematic for antitrust purposes, believing that MLBP's licensing fees are "entirely responsive to the preferences of licensees and retail product consumers.” Maj. Op. at 324-26. Such a distinction between royalty rates and uniform prices is meaningless. First, for purposes of the Sherman Act, prices "are fixed because they are agreed upon," whether it be in the form of a uniform price or a price set by formula. Socony-Vacuum Oil Co., 310 U.S. at 222, 60 S.Ct. 811. Competitors who agree to fix royalty rates, no less than competitors who agree to fix a single uniform price, violate the Sherman Act. MLBP’s expert does not even contest that it has fixed a single price in this case. See Fisher Report ¶ 29-30 ("MLBP has chosen to set a single price (or royalty rate) irrespective of the popularity of a Club.... ”). Second, whether or not an agreed upon price is responsive to consumer demand is irrelevant. See Socony-Vacuum Oil Co., 310 U.S. at 222-23, 60 S.Ct. 811 ("[T]he fact that, as here, [prices] are fixed at the fair going market price is immaterial. For purchases at or under the market are one species of price-fixing."). The antitrust laws seek to ensure that the determination of price is by free competition alone; the reasonableness of an agreed upon price is not a defense. See id. at 223, 60 S.Ct. 811; Catalano, Inc., 446 U.S. at 647, 100 S.Ct. 1925.
Furthermore, the majority incorrectly believes that the licensing fees are "entirely responsive” to demand. A simple example displays the majority's fallacy. Take Club C, a Club that has two fans A and B. A is willing to pay $15 for a Club C hat while B is willing to pay $12 for the same hat. Assume that Producer P will sell Club C hats at its marginal cost to produce them of $10 and assume that MLBP charges a 20% license fee. Under this scenario, the price for a licensed hat would be $12.50 (price = $10/(1-0.20)), and only A would be willing to buy a Club C hat. However, if Club C was pricing its own licenses, it could drop the license fee to 15%, in which case both A and B would be willing to buy Club C hats for $11.76, and licensing revenue for Club C would increase from $2.50 to $3.52. As this example shows, the licensing fees here are not totally responsive to consumer demand. Basic principles of economics teach us that as royalty rates increase, the price for licensed goods will increase, and output will decline as fewer consumers are willing to purchase licensed goods at higher prices. This is Salvino’s central contention'— that if the Clubs were forced to compete with each other for licensing fees, they would offer licenses at lower rates, thereby resulting in lower prices (and increased output) for licensed goods.

. MLBP further argues that eliminating price competition between the Clubs causes no harm to the market because the Clubs must compete with a wide array of entertainment entities, including other sports leagues and entertainment companies, in the licensing of intellectual property, and therefore lack the market power necessary to affect prices.

. For a detailed explanation of the per se, quick look, and rule of reason methods of analysis under the Sherman Act, see Part II.B of the majority opinion. See Maj. Op. at 31316.

. The doctrine of ancillary restraints has its roots in an 1898 opinion by then-Judge Taft. See United States v. Addyston Pipe & Steel Co., 85 F. 271, 280-83 (6th Cir.1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). The principle has been adapted over the last few decades to the context of joint ventures, as noted in the cases cited above.

. However, a non-ancillary restraint is not necessarily unlawful or evaluated under a per se rule; rather, it is simply evaluated independent of the joint venture because its competitive effects are irrelevant to the joint venture and vice versa. Conversely, an ancillary restraint is not necessarily lawful. Its competitive benefits and harms must still be weighed, as part of the joint venture, under a rule-of-reason analysis. See Sullivan v. Nat’l Football League, 34 F.3d 1091, 1102 (1st Cir.1994).

. Several courts and commentators have — I believe correctly — viewed Broadcast Music and NCAA, the two cases primarily relied upon by the majority, as implicit applications of the ancillary restraints analysis. See, e.g., Sullivan, 34 F.3d at 1102; Polk Bros., 776 F.2d at 189; see also XI Herbert Hovenkamp, Antitrust Law ¶¶ 1908b, 1908d, 1908e, at 253-58, 261-65 (2d ed.2005). In Broadcast Music, the need to reach some pricing agreement was necessary in order to sell a blanket license; otherwise, the product would not have been possible at all. See 441 U.S. at 20-23, 99 S.Ct. 1551. Consequently, the Court examined the venture as a whole, implicitly viewing the pricing restraint as ancillary. In contrast, the Court reviewed the television agreement in NCAA as a non-ancillary naked restraint, apart from the rest of the joint venture, because the Court could not find any reason for the agreement that would be rea *340 sonably necessary to achieve any of the efficiency-enhancing objectives of the NCAA. See 468 U.S. at 113-15, 104 S.Ct. 2948; see also Texaco Inc., 547 U.S. at 7, 126 S.Ct. 1276 (citing NCAA as an application of the ancillary restraints doctrine).

. Salvino argues that "there are better ways to address” the externalities than these two challenged provisions. Whether the external-ities could be eliminated in a substantially less restrictive manner is an inquiry that should generally be part of a rule-of-reason analysis rather than part of a per se or quick-look approach. See, e.g., Care Heating & Cooling, Inc. v. Am. Standard, Inc., 427 F.3d 1008, 1012 (6th Cir.2005).

. Empirical analysis could ultimately show that the anticompetitive harms from the challenged provisions outweigh any procompeti-tive benefits. The point is simply that Salvi-no’s expert recognized that empirical analysis is necessary to determine whether these provisions have a positive or negative competitive effect. When empirical analysis is required to determine a challenged restraint's net competitive effect, neither a per se nor a quick-look approach is appropriate because those methods of analysis are reserved for practices that "facially appear[ ] to be one[s] that would always or almost always tend to restrict competition and decrease output.” Broad. Music, 441 U.S. at 19-20, 99 S.Ct. 1551; see also Texaco Inc., 547 U.S. at 7 n. 3, 126 S.Ct. 1276 (explaining that a quick-look analysis applies only where "business activities are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability”).

.Salvino argues that the exclusivity and profit-sharing provisions are not essential to the success of MLBP. Even if true — one certainly could imagine MLBP prospering without these provisions — the analysis here is not altered. Under the ancillary restraints doctrine, a challenged restraint need not be essential, but rather only "reasonably ancillary to the legitimate cooperative aspects of the venture.” Freeman, 322 F.3d at 1151; see also Polk Bros., 776 F.2d at 189 (explaining that a restraint is ancillary if it may promote the success of the more extensive cooperation and will then be scrutinized under the rule of reason).