**ADDAMAX CORPORATION, Plaintiff,**

v.

**OPEN SOFTWARE FOUNDATION, INC., Digital Equipment Corporation, and Hewlett–Packard Company, Defendants.**

Civ. A. No. 91–11152–JLT.

United States District Court,
D. Massachusetts.

May 19, 1995.

Samuel Adams, Ralph T. Lepore, III, Keith C. Long, Warner & Stackpole, Boston, MA, James V. O'Gara, Alan R. Kusinitz, Patricia Oveis Kahn, Kelley, Drye & Warren, New York City, for Addamax Corp.

James C. Burling, Michelle D. Miller, Charles J. Gray, Peter A. Spaeth, Hale & Dorr, Boston, MA, for Open Software Foundation, Inc.

William L. Patton, Eric Jaeger, Ropes & Gray, Boston, MA, Richard H. Alpert, Digital Equipment Corp., Maynard, MA, for Digital Equipment Corp.

Robert W. Sutis, Hewlett–Packard Co., Palo Alto, CA, Robert A. Skitol, Drinker, Biddle & Reath, Washington, DC, Brian A. Davis, Robert S. Frank, Jr., Kevin P. Light, Nicholas J. Nesgos, Choate, Hall & Stewart, Boston, MA, for Hewlett–Packard Co., Inc.

James B. Conroy, Donnelly, Conroy & Gelhaar, Boston, MA, for G2 Computer Intelligence, Inc.

## MEMORANDUM

TAURO, Chief Judge.

This dispute unfolds against the backdrop of the multi-million dollar market for operating systems, the machine language programs that coordinate the activities of a computer's hardware components.[1]  Plaintiff Addamax Corporation, a producer of security systems for the computer industry, is suing Hewlett–Packard ("H–P"), the Digital Equipment Corporation ("Digital"), and the Open Software Foundation ("OSF"), alleging violations of federal and state antitrust laws.  The complaint alleges that Digital and H–P led an attempt to influence the market for operating systems technology by illegally combining the buying power of the industry's largest competitors.

The defendants have moved for summary judgment, arguing that Addamax's case fails with respect to several elements essential to any antitrust claim.  In applying an old statute to new technology, the court examines these issues with an eye to the underlying purpose of the antitrust laws: the efficient functioning of competitive markets.  *Ocean State Physicians Health Plan, Inc. v. Blue Cross and Blue Shield of Rhode Island*, 883 F.2d 1101, 1110 (1st Cir.1989) (*citing Standard Oil Co. v. Federal Trade Commission*, 340 U.S. 231, 248–49, 71 S.Ct. 240, 249–50, 95 L.Ed. 239 (1951)), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990);  P. AREEDA, H. HOVENKAMP, J. SOLOW & D. TURNER, ANTITRUST LAW, ¶ 104.

---

1. Operating systems coordinate the activities of the computer's hardware, allowing it to "run" applications software.  Operating systems, like other programs, are considered intellectual property, and rights to operating systems are routinely bought, sold, and licensed.

## I. BACKGROUND

In considering a motion for summary judgment, the court must view the record "in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990). The following statement of facts is drawn accordingly.

### A. The Market for Operating Systems.

Operating systems coordinate the activities of the computer's hardware components, allowing it to "run" applications software. The systems are designed to "fit" specific hardware. Software is in turn manufactured to be compatible with certain operating systems. The industry's three-tier system (hardware, software, and operating systems) has produced a complex market shaped by licensing agreements and compatibility concerns.

The Babel-like character of the market for operating systems has produced periodic calls for the harmonization of operating system specifications. This lawsuit revolves around a joint venture, the Open Software Foundation, ostensibly formed for this purpose.

### B. the Formation of the OSF Joint Venture.

The Open Software Foundation ("OSF"), was formed in 1988 by a group of eight computer manufacturers.[2] OSF exists as a not-for-profit joint venture, and is registered as such under federal law.[3]

OSF membership is open to corporations, non-profits, academic institutions, governmental agencies, and "other business entities." (Defendants' Memorandum in Support, Appendix III, Tab 2, By–Laws of Open Software Foundation, Inc., Article 3). OSF by-laws provide for two classes of partic-

ipation. The founding corporations are referred to as "sponsors." Sponsors retain exclusive voting rights in the foundation. All other participants, (some three hundred and fifty at the time this suit was filed) are referred to as "members."

OSF's sponsors include many of the major competitors in the market for computer systems. The list includes several of the largest computer companies in the world, including H–P, Digital, IBM, and Bull Systems. According to the complaint, these companies compete with one another in two separate markets. First, they compete in the purchasing of systems technology from independent developers like Addamax. Second, they compete in the sale of finished systems on the downstream market for operating systems. The sponsors, in other words, compete both "in markets where they are sellers and in markets where they are buyers." (Plaintiff's First Amended Complaint, ¶ 20.)

OSF's statement of purpose indicates that the organization was formed to "undertake cooperative research, experimentation and development activities ... to allow users to more easily mix and match computers and software from different suppliers." 53 Fed. Reg. 34594 (1988). To this end, OSF and the OSF Research Institute indicated an intent to engage in a wide array of activity, including "[t]he production and marketing of the software or other proprietary information or technology produced through the venture including the granting of licenses." *Id.* at 34594.

### C. OSF's Procurement Process.

OSF, in keeping with its corporate charter, became involved in the development of new operating systems. In developing its first such operating system, later baptized OS–1, OSF chose to assemble the package by fusing existing technology. As a result, most of OSF's efforts were directed towards purchas-

---

**2.** Only two of these companies, H–P and Digital, are named as defendants in this suit.

**3.** OSF is registered under the National Cooperative Research Act of 1984, 15 U.S.C. § 4301. The National Cooperative Research Act, designed to encourage cooperative research, offers some antitrust protection to joint ventures formed for

specifically enumerated purposes. 15 U.S.C. § 4301(a)(6).

OSF is also registered under the laws of Delaware as a not-for-profit membership corporation, and as the only member of the Open Software Foundation Research Institute also incorporated under Delaware law.

ing and integrating existing component programs.

OSF's gathered technology for the OS–1 system through a competitive bidding process called a Request for Technology, or "RFT." Companies specializing in a particular area were informed of the process and encouraged to submit bids.

With respect to Addamax, the bid involved a security program[4] for the new operating system. Two companies responded to the bid: Addamax and SecureWare. After an evaluation of the competing bids, a panel of experts appointed by OSF selected the Secureworks package.

### D.  Addamax's Allegations

Addamax is now claiming that they lost the bid for reasons unrelated to the price and quality of their product. More importantly, Addamax is alleging that the entire OSF concept is an illegal joint venture designed to influence the market for operating systems technology.

Addamax makes two charges with respect to OSF's strategy. First, Addamax asserts that OSF has rigged its procurement system to favor specific companies and technologies. Second, Addamax claims that OSF forces suppliers to sell their product to OSF and its sponsors under disadvantageous conditions.

With respect to the Request for Technology process, Addamax asserts that OSF ran a suspect contest. Addamax claims that internal OSF documents named SecureWare as the security system component several months before the bids were submitted. (*OSF Goethe Project Journal,* July 7, 1989, Plaintiff's Appendix I, Volume II, Tab 107, at F055653).

With respect to OSF's effect on prices, Addamax alleges that the joint venture forced competitors to offer their products at below-market prices and under disadvantageous conditions.[5] Companies are forced to do this, Addamax claims, because failure to win the bid excludes the developer from a huge segment of the market. The loser sees his technology left out of a new system that automatically becomes an industry standard. A firm that fails in an OSF bid looses the chance to sell its product, not only to OSF, but to all OSF members. In this way, Addamax claims, OSF functions as a joint purchasing agreement, or buyers' cartel.

On the basis of these alleged activities, Addamax brought suit against OSF and two of its sponsors, Digital and H–P. The complaint contains claims under federal and state anti-trust law, the state unfair trade practices act, and state common law. The defendants have moved for summary judgment with respect to each claim.

### II.  SUMMARY JUDGMENT IN ANTI–TRUST CASES

In *Poller v. Columbia Broadcasting,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Supreme Court warned that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is in the hands of alleged conspirators, and hostile witnesses thicken the plot." *Id.* at 473, 82 S.Ct. at 491 (citations omitted).

The admonition in *Poller* notwithstanding, antitrust suits are not immune from summary judgment, and rule 56(c) is routinely used in antitrust actions. *See Capital Imaging, P.C. v. Mohawk Valley Medical Associates,* 996 F.2d 537, 541 (2nd Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993); *Midwest Radio v. Forum Publishing,* 942 F.2d 1294, 1296 (8th Cir.1991).

---

4.  The security component of an operating system "enables computer owners to prevent unauthorized individuals from obtaining access to their computer systems or authorized individuals from obtaining access to information beyond their individual security clearance." Plaintiff's First Amended Complaint, ¶ 9.

5.  Addamax maintains that OSF extracts major concessions from its suppliers in terms of both price and conditions-of-sale. Addamax claims that OSF's strategies secure software at a fraction of its market price, and in some instances at prices below those necessary to recoup research and development costs. In addition, Addamax claims that OSF forced suppliers into disadvantageous licensing agreements.

### III. OVERVIEW OF THE SHERMAN ACT, § 1.[6]

The Sherman Act, 15 U.S.C. § 1 *et seq.*, prohibits:

[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ...

15 U.S.C. § 1. This simple phrase reveals the basic components of every § 1 claim: a conspiracy and its anticompetitive effect.

The essence of every § 1 claim is "a combination or some form of concerted action between at least two legally distinct entities." *Capital Imaging, P.C. v. Mohawk Valley Medical Assoc.*, 996 F.2d 537 (2nd Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Section 1, in other words, does not apply to "unilateral conduct on the part of a single person or enterprise." *Id.*

Not every agreement, however, constitutes a violation of the Sherman Act. After establishing the existence of a contract, combination, or conspiracy, the plaintiff must establish that the agreement constitutes an "unreasonable restraint on trade." To identify the agreements that fail this test, courts have adopted two levels of analysis: *per se* and "rule of reason."

A limited number of agreements are considered unreasonable *per se* and, therefore, are illegal as a matter of law. *Per se* treatment is limited to those cases in which the agreements are manifestly or patently unreasonable, and clearly serve no legitimate purpose. The agreements that typically fall into the *per se* category involve price fixing, boycotts, and tying arrangements. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985).

Cases that do not fall into "the narrow *per se* niche" proceed under the rule of reason. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993). To establish a claim under the rule of reason, a plaintiff "bears the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market ..." *Capital Imaging,* 996 F.2d at 543. If the plaintiff meets this initial burden, the defendant can come back with evidence that the agreement was formed for legitimate business purposes which outweigh any anti-competitive effects. Finally, the plaintiff can prevail by showing that the legitimate ends of the agreement could have been accomplished through less restrictive alternatives.

### IV. ANTITRUST INJURY; CONSPIRACY

Every section 1 claim, whether *per se* or rule of reason, must satisfy two threshold requirements. First, the plaintiff must prove more than "mere injury." The successful section 1 plaintiff must establish "antitrust injury." Second, the plaintiff must prove the existence of a conspiracy. The defendants challenge Addamax's case as insufficient in both respects.

#### A. Antitrust Injury

The defendants first major argument is that the plaintiff has failed to allege adequate antitrust injury.[7] Courts have often noted that the antitrust laws are aimed at protecting competition, not competitors, and that not all business losses constitute the type of injury that the antitrust laws were designed to prevent. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977).

[Antitrust] plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation.

*Brunswick Corp.*, 429 U.S. at 489, 97 S.Ct. at 697.

---

6. The "overview" portion of this memorandum is drawn largely from *Capital Imaging, P.C. v. Mohawk Valley Medical Assoc.*, 996 F.2d 537 (2nd Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

7. The seminal case on antitrust injury is *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Brunswick,* the Court noted the type of damage required to state a claim under the Sherman Act:

Along these lines, the defendants note that to the extent that Addamax complains of lower prices for its product, this type of loss falls beyond the protection of the antitrust laws.

Lower prices usually benefit consumers, and are not generally considered harmful to competition. For this reason, agreements to set prices at below-market rates do not ordinarily give rise to antitrust injury.[8] *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 337–338, 340, 110 S.Ct. 1884, 1890–1891, 1892, 109 L.Ed.2d 333 (1990); *Kartell v. Blue Shield of Massachusetts,* 749 F.2d 922, 930–931 (1st Cir.1984), *cert. denied,* 471 U.S. 1029, 105 S.Ct. 2040, 2049, 85 L.Ed.2d 322 (1985) (antitrust laws protect against higher, not lower, prices).

But, when lower prices input prices do not produce lower prices to consumers, courts have found antitrust injury in the presence of agreements to lower prices. *Vogel v. American Society of Appraisers,* 744 F.2d 598, 601 (7th Cir.1984), *citing Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,* 334 U.S. 219, 223–24, 68 S.Ct. 996, 999–1000, 92 L.Ed. 1328 (1948). This occurs when the colluding buyers possess market power on a downstream market. Only with control of a downstream market can the monopsonist[9] decrease output and raise prices. *See* J. Jacobson & G. Dorman, *Joint Purchasing, Monopsony and Antitrust,* THE ANTITRUST BULLETIN, 1, 17 (Spring, 1991); AREEDA ET AL., ANTITRUST LAW, ¶ 574.[10] Here, Addamax has made a threshold showing of the defendants' significant leverage on both relevant markets: the upstream market for inputs, and the downstream market for output. *See infra* Part V.B.1. (market power).

With respect to Addamax's standing as a plaintiff in this case, the court finds that Addamax has properly alleged that their injury "flow[ed] from that which makes the defendants' act unlawful." *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. at 697. In so doing, this court is mindful of the First Circuit's admonition that "even where a violation exists and a plaintiff has been damaged by it, the courts—for reasons of prudence—have sought to limit the right of private parties to sue for damages or injunctions." *SAS of Puerto Rico, Inc. v. Puerto Rico Telephone Company,* 48 F.3d 39 (1st Cir.1995).

Addamax's harm allegedly "flows directly from collusive activity that decreases competition among buyers." R. Blair & J. Harrison, *Antitrust Policy and Monopsony,* 76 CORNELL L.REV. 297, 337 (1991). Given these circumstances, the court holds that Addamax, as a seller to a collusive monopsony, has alleged sufficient antitrust injury, and has the standing necessary to bring this suit. *SAS of Puerto Rico Inc. v. Puerto Rico Telephone Co.,* 48 F.3d 39, 44 (1st Cir.1995) (antitrust injury exists where "the seller is a participant in the very market where competition is impaired").

## B. Conspiracy

The defendants' second major argument is that OSF, as a joint venture, cannot constitute a contract, combination, or conspiracy within the scope of § 1. Whatever OSF did, the defendants argue, it did on its own, and unilateral action may not constitute a conspiracy.[11]

---

8. An exception to this rule, not directly relevant here, occurs when the conspirators fix prices at "predatory" levels. A predatory price (price below cost) is designed to eliminate competition and ensure later monopoly profits.

9. Monopsony, the mirror image of monopoly, refers to "market power . . . on the buying side of the market." AREEDA ET AL., ANTITRUST LAW, ¶ 574.

10. Areeda and Turner summarize the effect on prices as follows:

> The monopsony buyer, unlike the competitive buyer, can reduce the purchase price by scaling back its purchases. Because the monopsonist ordinarily reduces its buying price by purchasing less, it sells less downstream. This reduction in its own output will, if it has market power on the selling side, mean higher prices for customers. Thus, lower buying prices upstream may translate into higher selling prices downstream.

AREEDA ET AL., ANTITRUST LAW, ¶ 574 (footnotes omitted).

11. The defendants' memorandum in support reads:

> . . . the sole basis for Addamax's price-fixing claim is that OSF *itself* allegedly sought to purchase security software at a reduced price. However, a joint venture such as OSF is not a "walking conspiracy," and as a matter of law, neither OSF's simple existence nor its unilateral actions with respect to price is sufficient to

■ While it is true that joint ventures are not unreasonable in and of themselves, *SCFC ILC. v. Visa USA,* 36 F.3d 958, 964 (10th Cir.1994), it is also true that conspirators cannot gain immunity from the antitrust laws by labelling their agreement a "joint venture." *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 975, 95 L.Ed. 1199 (1951).[12]

■ A review of the relevant case law suggests that joint venture agreements are addressed like any other agreement among competitors. E. KINTNER, FEDERAL ANTITRUST LAW, § 9.15 (listing cases); *SCFC ILC.,* 36 F.3d at 964 (no "special treatment" for joint ventures under the antitrust laws). The first step is to determine the nature and scope of the agreement. If the joint venture is unlawful in purpose and effect, the joint venture is treated like any other *per se* violation of the Sherman Act. If, on the other hand, the joint venture is based on a lawful attempt to integrate resources, the agreement is measured according to the standard "rule of reason" analysis. AREEDA ET AL., ANTITRUST LAW, ¶ 1478 *et seq.*

■ H–P and Digital probably had several legitimate reasons for launching the OSF joint venture. But, Addamax has produced evidence that H–P and Digital formed OSF at least in part to impair the progress of certain competitors. This evidence alone, in the form of internal memoranda and strategy papers discussed in more detail below, raises a genuine issue of fact as to whether the joint venture itself can be labelled a conspiracy for Sherman Act purposes.

establish a conspiracy among OSF and the Sponsors.
Defendants' Memorandum in Support of Motion for Summary Judgment, p. 12.

**12.** The Supreme Court in *Timken* made explicit reference to joint ventures in the antitrust context:

Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a "joint venture." Perhaps every agreement and

## V. ANALYSIS

### A. *Per Se* Claims

Addamax has asked for *per se* scrutiny with respect to all of its state and federal antitrust claims.[13] As the First Circuit noted in *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589 (1st Cir.1993), *per se* claims enjoy significant advantages in matters of proof: "[t]he advantage to a plaintiff is that given a *per se* violation, proof of the defendant's power, of illicit purpose and of anticompetitive effect are all said to be irrelevant.... the disadvantage is the difficulty of squeezing a practice into the ever narrowing *per se* niche." *U.S. Healthcare,* 986 F.2d at 593 (internal citations omitted).

The Supreme Court has held that *per se* treatment is appropriate only in the presence of:

agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Addamax's complaint alleges that the OSF agreement warrants *per se* treatment because OSF operates as a buyer's cartel, and because OSF's very purpose, the promotion of the Sponsors' technology, is anticompetitive.

### 1. price fixing and joint buyers' cartel.

■ Addamax's complaint contains related price-fixing and joint buying claims. The

combination to restrain trade could be so labeled.
*Id.* 341 U.S. at 598, 71 S.Ct. at 974–75 (citations omitted).

**13.** The scope of the Massachusetts Antitrust Act, 93 M.G.L. ch. 93 § 4, is statutorily tied to its federal law analog, § 1 of the Sherman Act. *See* M.G.L. ch. 93 § 1; *Winter Hill Frozen Foods and Services, Inc. v. Haagen–Dazs Co.,* 691 F.Supp. 539 (D.Mass.1988). Discussion of Addamax's state law claim is accordingly "subsumed" into the discussion of the applicable federal statutes. *Id.,* at 543 n. 5.

essence of these charges is that OSF's purpose was to operate as a joint buying group in order to exercise control over the market for operating systems technology.

Addamax's allegations of "price fixing" turn largely on a series of statements made by an OSF representative, Doug Hartman, in the context of bid negotiations with Addamax's president, Peter Allsberg. In response to Allsberg's questions, Hartman indicated that OSF was not going to offer more than "six figures" for Addamax's technology. Plaintiff's Appendix II, Deposition of Peter A. Allsberg, 0143;15–19.

Allsberg recalls that when he told Hartman that the figure was far below Addamax's development costs, much less what they thought was a fair price, Hartman shrugged and told him that "the market has changed." Allsberg Dep. 0145;6–7. Allsberg then asked Hartman: "is what you are telling me I can sell to you at your price and get a little money out of the market now and have no future business, or you will buy from Secure-Ware at that price and I will get no money out of the market now and have no future business?" Hartman replied, "Well, you could look at it that way." Allsberg Dep. at 0145;9–23.

This evidence notwithstanding, the court finds Addamax's price fixing claim inappropriate for *per se* treatment. *Per se* treatment is reserved for those combinations whose purpose *and* effect is manifestly anticompetitive. Because joint purchasing agreements often produce legitimate economies of scale,[14] courts have generally refused to find these agreements illegal under the *per se* standard.[15] *See* R. Blair & J. Harrison, *Cooperative Buying, Monopsony Power, and Antitrust Policy*, 86 NORTHWESTERN L.REV. 331, 343–345 (1992) (describing cases in which courts refused to apply *per se* stan-

dard in cooperative buying context). Rather, plaintiffs generally are required to make their case under the "rule of reason," by proving that the anticompetitive effect of the buying agreement outweighs any pro-competitive advantages.

With respect to this case, it is clear that the effects of market standardization on the computer industry are extraordinarily difficult to gauge. Moreover, without the benefit of expert opinion, it is nearly impossible to predict the specific effect of OSF's actions on competition within the industry. The sheer complexity of the industry cautions against a *per se* analysis here. *See M & H Tire Company, Inc., v. Hoosier Racing Tire Corporation*, 733 F.2d 973, 977 (1st Cir.1984) (avoiding *per se* analysis in "novel context").

### 2. unlawful purpose

■ Similar considerations compel the same caution with respect to Addamax's claim that OSF was formed for an anticompetitive purpose. Addamax alleges that OSF was formed "to thwart the nascent movement towards truly open systems by, among other things, collectively attacking the movement's two leading proponents and more efficient rivals, AT & T and Sun." Plaintiff's Memorandum in Opposition, 21.

There is substantial evidence, in the form of internal H–P and OSF memoranda, that OSF was formed specifically to combat Sun and AT & T. At H–P, officials met at a "Beat Sun" conference to discuss the possibility of joining other manufacturers in a UNIX consortium. The context of the discussions makes it clear that the consortium was discussed as a answer to Sun and AT & T's aggressive moves on the market. Plaintiff's Appendix I, Volume I, Tab 37, HP–72173 ("Beat Sun" Offsite Minutes). These actions, unremarkable if taken by a single

---

**14.** A second reason for the more lenient treatment given joint purchasing agreements is a result of the relationship between the likely plaintiff and the likely defendant: the company alleging the violation is not a direct competitor of the companies forming the buying cartel.

**15.** There is one relevant exception to the "rule of reason" standard for buyer's cartels. A joint buying agreement will be illegal *per se* if "the buyer [is] ... a 'sham' organization seeking only

to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up price." *Kartell v. Blue Shield of Massachusetts*, 749 F.2d 922, 925 (1st Cir.1984). Again, however, Addamax has produced no evidence that OSF was formed to in order to suppress the sponsors' "competitive instinct to bid up price." Addamax's buyer's cartel claims do not warrant per se scrutiny.

competitor, may be suspect when taken by a group of would-be competitors.[16] The record contains ample evidence that Digital and H–P, among others, communicated among themselves with regards to a collective "anti-Sun/AT & T" strategy. *Id.* at HP–72176.

Again, however, the context of this case makes it inappropriate for *per se* analysis. Despite some evidence of an anti-competitive motive, it is not clear that the OSF joint venture had an anticompetitive effect on the market. On the record before the court, it cannot be said that the OSF joint venture is so void of redeeming virtue that it must be "presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Having determined that the defendants are entitled to summary judgment with respect to each of the plaintiff's *per se* claims, the court turns to the rule of reason elements of the plaintiff's complaint.

## B. Rule of Reason

■ To state a Sherman Act claim under the rule of reason, Addamax bears the initial burden of establishing that OSF's actions have "an actual adverse effect on competition as a whole in the relevant market." *Capital Imaging,* 996 F.2d at 543. If the defendant then comes forward with a legitimate justification for the conduct, the plaintiff must show that the same legitimate purpose could have been obtained through less restrictive means. *Id.*

### 1. market power

■ An essential element of every rule of reason claim is a showing that the defendants exercised market power in some relevant market.[17] In this case Addamax has alleged that OSF and its sponsors possess significant market power in: (1) the market in which the defendants purchase security systems, and (2) the market in which the defendants sell operating systems. Conceding, for the purposes of this motion, the definitions of the relevant markets,[18] the defendants argue that the plaintiffs cannot prove collective market power sufficient to prove a violation of the rule of reason.

The defendants argue that the calculation of market share in this case may include only purchases and sales attributable directly to OSF. The plaintiffs, however, argue that the defendants' collective market share must include the purchases and sales of the individual sponsors. The parties, in other words, disagree on whether the individual sponsors' shares of the markets should be included in gauging the joint venture's impact on the market.

The dispute is significant. As a percentage of the global market for operating systems, OSF's sales are so small as to be insignificant. The same may be said for OSF's purchases of security systems' technology. If, however, market share is calculated to include the purchases and sales made by the individual sponsors, the defen-

16. The fact that OSF's alleged anticompetitive purpose was directed at Sun and AT & T, not Addamax, is not relevant to the analysis. It is sufficient that the harm to Addamax "flowed from" OSF's anticompetitive purpose. *See* part IV.A., *supra.*

17. For reasons discussed earlier in this memorandum, a seller to a collusive monopsony must establish that the conspiring defendants exercised market power on two relevant markets: the market for the seller's inputs and the market for the buyers' output.

The search for relevant markets here is complicated by several features unique to the computer industry. The market for computer systems is unlike the market for "widgets" that typically frames antitrust analysis. The technology at issue, by its very nature, is not sold in units. Sales agreements may be for licenses, royalties, or combinations of the two, and one company's choice of technology may have important repercussions on the industry as a whole. In addition, as noted earlier, systems are often assembled from existing technology, further complicating the search for the "relevant market" in antitrust terms.

18. The defendants' objection to Addamax's definition of the relevant markets is limited to a single footnote. Defendants' Memorandum in Support, 24 n. 18. Without passing on the validity of Addamax's market definitions, the court limits its inquiry to the arguments fully developed in this motion for summary judgment.

dants collectively control significant shares of both markets.

The individual sponsors continue to make independent purchases and sales of security software and operating systems technology. As a result, OSF is merely an additional buyer of security systems technology and an additional seller of finished operating systems. Under these conditions, a court would not ordinarily consider the market power of the individual members of the joint venture in determining the market share of the alleged conspiracy. *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.,* 619 F.Supp. 441, 451 n. 8 (N.D.Cal.1985).

The essence of Addamax's complaint, however, is that OSF affects the industry by establishing de-facto industry standards, and the volume of OSF's purchases and sales are not of particular concern to the alleged conspirators. The leverage of the conspiracy, Addamax argues, is not market power as measured in purchases and sales. It is, rather, the simple fact that OSF's choice of technology amounts to an unqualified endorsement of that technology by seven or eight giants of the industry. Once OSF has blessed a particular technology by including it in a operating system package, competing technologies become obsolete.

The nature of the anticompetitive behavior alleged, coupled with the unique and unexplored characteristics of the market at issue, lead to the conclusion that Addamax has raised a genuine issue of fact with respect to the monopsony power of the conspiring defendants. Whether or not it is appropriate to aggregate the market power of the defendants in assessing market share, Addamax has put forth evidence that H–P and Digital were aware of, and in fact counted on, OSF's ability to influence the relevant markets.[19] This alone might suggest a triable issue of fact with respect to the sponsors' collective market power.

Finally, it is worth noting that market share is not always a reliable indicator of monopoly (or monopsony) power. AREEDA ET AL., ANTITRUST LAW, ¶ 515. In this case, Addamax has put forth evidence that suggests that OSF's monopsony power extends beyond its immediate share of the market.

### 2. anti-competitive effect

Expanding upon its challenge to Addamax's allegations of antitrust injury, the defendants next argue that even if Addamax could show harm to itself, it cannot show harm to *competition.* As has already been noted, the defendants correctly assert that harm to competition, not competitors, is the hallmark of every antitrust claim. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

The defendants argue that Addamax cannot prove that OSF's presence affects the market in any of the ways traditionally associated with harm to the competitive process: higher prices or lower output. Although Addamax has been unable to point to specific evidence of increased consumer prices or decreased product output, the court concludes that Addamax has established a genuine issue of fact as to OSF's effect on competition in the industry. Addamax's complaint, combined with deposition transcripts and documents submitted by the parties, permit an inference that OSF, H–P, and Digital embarked in a course of conduct designed to confuse and paralyze the market.

The computer industry is characterized by market turbulence. This year's state-of-the-art may be next year's dinosaur. But, buyers nonetheless want assurances that their systems will remain viable in the future. The industry has coined a term to describe the market's preoccupation with the future of a particular technology. The term is "FUD," an acronym for "fear, uncertainty and doubt."

**19.** Several documents suggest that OSF's original sponsors recruited IBM and other computer companies in a conscious effort to increase OSF's leverage on the market. *See* Plaintiff's Appendix I, Volume II, Tab 61 at HP53240; *Id.* at Tab 72, FO52024; *Id.,* Volume I, Tab 37 at HP72176. This evidence, though not entirely unambiguous, supports the inference that the sponsors themselves believed that OSF could influence the market. These documents, particularly when viewed in the light most favorable to the non-moving party, clearly raise genuine issues of fact with respect to the defendants' collective monopsony power.

Addamax claims that the defendants used "FUD" as a weapon by fomenting questions about the future of industry standards. By announcing the formation of OSF, and promising new technology destined to become the industry standard, the Sponsors allegedly sought to paralyze the industry and deter users from committing to other systems.

Several pieces of documentary evidence support Addamax's claim. An OSF interoffice memo suggests that the joint venture was developed at least in part because "[o]ur sponsors wanted a hammer, axe or two-by-four that could be used to beat [the competition]." (Plaintiff's Appendix I, Vol. III, Tab. 110 at F30690). A Hewlett Packard memo, marked "company confidential," memorialized a discussion among HP executives:

> Impact of FUD on Sun. It was asserted that an aggressive push by the consortium might cause software developers to reconsider their commitment to the nonstandard elements of the Sun OS, thereby slowing Sun's market momentum. A goal of the consortium might be to position the AT & T/Sun OS as the nonstandard Unix operating system and attempt to put them in a defensive position.

Plaintiff's Appendix I, Vol. I, Tab. 37, HP–72177.

According to Addamax, this evidence indicates that OSF was formed not to create a new product, but to "bully the market" into adopting certain standards for computer products. These standards were consistent with the Sponsors' interests, and inhibited competition in their purchases of operating system components.

Addamax's position also finds some support in evidence that OSF did very little in terms of actual research and development.[20] Roger Gourd, head of engineering at OSF, admitted in deposition testimony that he was unaware of any research into "new product offerings," (Plaintiff's Appendix II, Deposition of Roger S. Gourd, 153:8–20), and it is undisputed that OSF is managed and staffed by personnel otherwise tied to the Sponsors.

Addamax has presented evidence of OSF's structure, purpose and strategy sufficient to support an inference of anticompetitive effect. This evidence, combined with the plausible hypothesis that a collusive monopsony eventually raises prices and restricts output, is sufficient to withstand a motion for summary judgment on Addamax's rule of reason claims.

## VI. OTHER CLAIMS

The plaintiff's suit also includes counts under the Clayton Act and under Massachusetts law. The defendants have moved for summary judgment on all of these claims, arguing that Addamax cannot raise genuine issues of fact with respect to essential elements of each of these claims.

### A. Clayton Act.

Addamax's complaint alleges violations of § 7 of the Clayton Act, which prohibits mergers or acquisitions that substantially lessen competition in a relevant line of commerce. See 15 U.S.C. § 18. The defendants argue that the transactions giving rise to this joint venture do not amount to a merger or acquisition, and are thus beyond the scope of the statute.

■■ It is true that the Clayton Act, by its own terms, applies only where there has been an acquisition of assets, stock, or other share capital. Id. In keeping with the broad mandate of the antitrust laws, however, courts have generally adopted a flexible approach in measuring the scope of this language. United States v. Philadelphia National Bank, 374 U.S. 321, 337–339, 83 S.Ct. 1715, 1727–1729, 10 L.Ed.2d 915 (1963); Mr. Frank, Inc. v. Waste Management, Inc., 591 F.Supp. 859, 866 (N.D.Ill., 1984) (noting that in the context of Section 7, the term "asset" may mean "anything of value.") (citations omitted).

■■ In this case, Addamax has submitted evidence indicating that the defendants acquired certain rights as a result of their contributions to the project. Some of these rights might properly be characterized as

---

**20.** A general lack of activity suggests that the true purpose in joining forces is not to integrate resources, but rather to exploit its market power. Timken, 341 U.S. at 597–98, 71 S.Ct. at 974–75.

giving the Sponsors a degree of control over OSF.[21] Although control itself does not implicate the transfer of stock or share capital, the acquisition of control has been deemed the "acquisition of an asset" for section 7 purposes. *Mr. Frank, Inc.*, 591 F.Supp. at 866.

Finally, Addamax correctly notes that the OSF "Formation and Funding Agreement" signed by the sponsors could be construed as transferring a tangible asset. Plaintiff's Appendix I, Volume I, Tab 48 at HP36022. Section 2.5 of that document provides that the sponsors' capital contributions may eventually be treated "as prepaid credit against cash royalties which may in the future become due ..." *Id.* Without deciding whether or not this transaction constitutes the "acquisition of asset," the court is satisfied that Addamax has produced a genuine issue of fact with respect to its Clayton Act claim.

## B. State Law Claims

In addition to the federal and state antitrust claims, Addamax's complaint contains a state law claim based on intentional interference with actual and prospective contractual relations.[22] This claim is grounded upon the allegation that at least one of Addamax's customers, Convex Computer Corp., cancelled a contract with Addamax after OSF's selection of SecureWare was announced, and that other companies refused to enter into contracts with Addamax after learning that SecureWare, not Addamax, had secured the OSF bid. With respect to Convex, Addamax claims that OSF's actions caused Convex to breach an exiting agreement with Addamax. Plaintiff's First Amended Complaint, ¶ 93. According to the complaint "Convex's deci-sion to breach its contract with Addamax stemmed directly from OSF's decision to select SecureWare as the OSF standard technology." *Id.* at ¶ 94.

■ To recover on a theory of intentional interference with actual or prospective business relations, a plaintiff must prove (1) the existence of business relations; (2) the defendant's knowing interference with the relations; and (3) the harm to the plaintiff borne of the defendant's actions. *See United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 21 (1990); *Comey v. Hill*, 387 Mass. 11, 438 N.E.2d 811, 816 (1982) (*quoting* J.R. Nolan, Tort Law § 72, at 87 (1979)); *ELM Medical Laboratory, Inc. v. RKO General, Inc.*, 403 Mass. 779, 532 N.E.2d 675, 681 (1989).

■ Addamax has shown an issue of fact with respect to each contested element. Addamax has presented evidence of a licensing agreement with Convex, (Plaintiff's Appendix II, Deposition of Randall J. Sandone, 3:115;19–21), and evidence of contractual negotiations with Tektronix, another potential customer. *Id.* at 3:113;6–7. Addamax has presented evidence that H–P and Digital knowingly interfered with these relations through illegal conduct.[23] Finally, Addamax has presented evidence that it was harmed by the defendants' actions. *Id.* at 15–19; 3:120;11–14.

The defendants argue that both Convex and Tektronix had entered into contracts with SecureWare before SecureWare was chosen by OSF. As a result, the defendants argue, OSF could not be to blame for these companies' choices. In making this argument, however, the defendants overlook the

---

**21.** The defendants submit that "the only indicia of Sponsorship is one seat on the Board of Directors." Defendants' Memorandum in Support, 30 & n. 21. In fact, however, the Sponsors may have obtained considerably more in exchange for their initial cash contributions. The Formation and Funding Agreement, Plaintiff's Appendix I, Vol. I, Tab 48, and OSF's by-laws, Plaintiff's Appendix III, Tab. 2, suggest that the Sponsors retain rights apart from and beyond their seat upon the board of directors. The Sponsors may, for example, alter, amend or repeal the by-laws without the consent of the board.

**22.** Having found that the defendants are not entitled to summary judgment on all state antitrust claims, the court finds it unnecessary to consider the defendant's motion with respect to Addamax's M.G.L. ch. 93A, § 11 claim.

**23.** It is important to note, with respect to this element of Addamax's claim, that a plaintiff need not establish that the defendants actions were motivated by malice towards the plaintiff. It is sufficient that Addamax show that (1) the defendants were aware of Addamax's business relations, and (2) that their illegal conduct interfered with these relations. *United Truck Leasing*, 406 Mass. 811, 551 N.E.2d 20, 23 (1990).

fact that Addamax need not establish that Convex and Tektronix chose SecureWare instead of Addamax. Addamax, rather, needs only to show that they had relations with these companies, and that the defendants knowingly interfered with them.[24] Addamax has met its burden with respect to these elements, and the defendants motion for summary judgment on Addamax's intentional interference with business relations claim must be denied.

## VII. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is allowed as to all of Addamax's *per se* claims, and denied in all other respects.

24. The timing of Addamax's several contractual relations may of course be relevant to the issue of whether or not the defendants interfered with Addamax's business relations. For the purposes of this motion, however, it is sufficient to note that the timing of the contracts, in and of itself, does not preclude Addamax's claim.